UNITED STATES v. INTERNATIONAL
UNION, UNITED MINE WORKERS
OF AMERICA et al.

Civ. No. 683–50.

United States District Court
District of Columbia.

March 3, 1950.

H. G. Morison, Asst. Atty. Gen., George Morris Fay, U. S. Atty., Washington, D. C., Joseph M. Friedman, Sp. Asst. to Atty. Gen., Samuel K. Abrams, Asst. U. S. Atty., Jess H. Rosenberg, Atty., Dept. of Justice, Washington, D. C., Charles W. Taylor, Atty., Dept. of Justice, Washington, D. C., of counsel, for petitioner.

Welly K. Hopkins, Harrison Combs, Willard P. Owens, Washington, D. C., M. E. Boiarsky, Charleston, W. Va., for respondents.

KEECH, District Judge.

This is an action brought by the United States under the Labor-Management Relations Act of 1947, hereinafter referred to as the Act, Section 208, 29 U.S.C.A. § 178, to enjoin continuance of a strike by the International Union, United Mine Workers of America (hereinafter called the Union), and John L. Lewis, President of the Union, and to direct those defendants and the other defendants, various coal operators and coal operators' associations signatory to the National Bituminous Coal Wage Agreement of 1948 (hereinafter referred to as the Operators), to engage in free collective bargaining in good faith for the purpose of resolving their disputes and to make every effort to adjust and settle their differences, as contemplated by the National Emergencies provisions of the Act.

The strike is the result of an unresolved labor dispute between certain bituminous coal operators and associations, producers

of a substantial part of the bituminous coal mined in the United States, and approximately 370,000 of their employees, represented by the Union. As shown by the record, the strike has resulted in a nation-wide paralysis of industry, with ensuing economic crisis.

Sections 206 to 208, inclusive, of the Act, 29 U.S.C.A. §§ 176–178, under the heading "National Emergencies," provide in detail the steps to be taken when, in the opinion of the President of the United States, a threatened or actual strike or lockout affecting an entire industry, or a substantial part thereof, engaged in trade or commerce among the several States or with foreign nations, or engaged in the production of goods for commerce, will if permitted to occur or to continue, imperil the national health or safety.

Pursuant to the authority vested in him by the Act, the President, concluding that a national emergency existed, on February 11, 1950, directed the filing of this action by the Attorney General on behalf of the United States. On February 11, 1950, a temporary restraining order was issued, ordering:

"1. That the defendant, International Union, United Mine Workers of America, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from continuing, in whole or in part, the strike now in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 (hereinafter referred to as the Agreement), and that the said Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from in any manner engaging in, permitting or encouraging the said strike or its continuation, in whole or in part.

"2. That the said Union, acting through its president and other appropriate officers, agents, servants and employees, forthwith instruct, and take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under the wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; and that the said Union, acting through the said officers, agents, servants, and employees cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue, in whole or in part.

"3. That the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from encouraging, causing or engaging in a lockout or strike or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement, or from in any manner interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines, or from changing, altering or deviating from the wages, hours, terms and conditions of employment set forth in the said Agreement, except by the mutual consent of the Union and the Operator defendant concerned, and from taking any action which would interfere with the Court's jurisdiction, or which would impair, obstruct or render fruitless the determination of this case by the Court.

"4. That the defendants engage in free collective bargaining in good faith for the purpose of resolving their disputes and that they make every effort to adjust and settle their differences as contemplated by the National Emergencies provisions of the Labor Management Relations Act, 1947."

Plaintiff's motion for preliminary injunction was set for hearing on February 20,

1950. On the morning of that day, all parties to the action stipulated that the motion for preliminary injunction should be decided on the complaint with exhibits, answer thereto with exhibits, and memorandum of the defendants Union and Lewis.

The defendants Union and Lewis moved orally to dismiss and vacate the temporary restraining order on the grounds set forth in their answer to the motion for preliminary injunction. The motion to vacate was denied.

At the same time, plaintiff filed a motion to extend the temporary restraining order to March 3, 1950, pending determination of the motion for preliminary injunction. This extension was granted.

Late in the afternoon of February 20, 1950, counsel for the Government filed a verified petition for a rule directing the Union to show cause why it should not be punished for civil and criminal contempt for failure to comply with the temporary restraining order, together with necessary supporting exhibits, and a memorandum of points and authorities in support of such petition. A rule was issued, directing the Union to appear on February 24, 1950, to show cause, if any it might have, why it should not be punished for civil and criminal contempt of court, and further providing that if it should be found that the alleged contempt be not sufficiently purged, a trial should be held on February 27, 1950.

Trial on the contempt charges occurred on February 27 and 28 and March 1, 1950. On March 2 the Court found the respondent Union not guilty, at which time the court filed a memorandum, D.C., 89 F.Supp. 179.

The instant matter for consideration and determination is the motion for preliminary injunction.

The defendants in their memorandum in support of answer to the motion for preliminary injunction recognize that the action here taken is directly in conformity with the National Emergencies provisions of the Act, but attack those provisions as being in violation of the Constitution of the United States, specifically, the First, Fifth, and Thirteenth Amendments, and contend that this court is without jurisdiction.

■ As to the constitutionality of the Act, first, it should be said that the provisions of the Act are not directed against the individual worker, but against the concerted action of a labor organization. That the Congress recognizes a distinction between the right to deal with the concerted action on the part of labor, through labor organizations and their agents, and the individual employee, is clearly spelled out by comparison of the provisions of Section 8 (b) and (d), 29 U.S.C.A. § 158(b, d), which limit the right to strike, Section 13, 29 U.S.C.A. § 163, which recognizes such limitations, and Section 208, which specifically provides for injunction against strikes when the national welfare is imperiled, with Section 502, the "Saving Provision." 29 U.S.C.A. § 143. The latter section specifically immunizes an individual employee from having to render labor or service without his consent, declares that the quitting of his labor by an individual employee shall not be illegal, and prohibits issuance of process to compel such labor or service without his consent.

■ As to the constitutionality of Section 208, this provision comes well within the opinion expressed by the late Mr. Justice Brandeis, where he recognized the right of the legislature, as distinguished from the courts, to limit the area of industrial strife, in the following language, (Duplex Printing Press Co. v. Deering, 254 U.S. 443, 488, 41 S.Ct. 172, 184, 65 L.Ed. 349, 16 A.L.R. 196, dissenting opinion): "All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute

190

processes of justice for the more primitive method of trial by combat."

Challenge of statutory limitations on the right to strike is not new, and their validity has been clearly upheld by various pronouncements of the Supreme Court. Dorchy v. State of Kansas, 272 U.S. 306, 47 S.Ct. 86, 71 L.Ed. 248; Texas & New Orleans R. Co. v. Brotherhood of Railway Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed 1877; Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

The federal power to invoke the injunctive process to halt strikes affecting the public at large exists even apart from statute. The landmark case in this field is In re Debs, 158 U.S. 564, at page 582, 15 S.Ct. 900 at page 905, 39 L.Ed. 1092, in which the court, addressing itself to a problem similar to that to which the National Emergencies procedure is directed, stated: "The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights intrusted by the constitution to its care."

It is clear from the decisions above cited that the national emergency procedures of the Act, directed as they are against concerted action of labor organizations and not against individual action of individual employees—and invoked in a setting of imminent peril to the nation—violate no inhibition in any of the amendments to the Constitution, and are entitled to articulation by the courts. In every previous instance when these procedures have been invoked and subjected to the same attack on constitutional grounds, the Act has been upheld by the Court. United States v. International Union, U.M.W., D.C., 77 F.Supp. 563, affirmed, D.C.Cir., 177 F.2d 29, certiorari denied 338 U.S. 871, 70 S.Ct. 140; United States v. International Longshoremen's and Warehousemen's Union et al., D.C., 78 F.Supp. 710; and other unreported cases.

■ The provisions of the Act having been held valid, Section 208(a) specifi-cally vests this court with jurisdiction. There can be no denial that the Congress has the power to vest and divest the inferior federal courts of jurisdiction, as the Supreme Court has repeatedly held. While it is true that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., for certain purposes divested the federal courts of injunctive power, Section 208 of the Labor-Management Act by specific terms confers such jurisdiction in certain labor disputes. Through this Act the Congress, functioning in the field judicially recognized as necessary for the protection of employers, operators, and more particularly the public in national emergencies, has in definite terms prescribed the procedure to be followed, namely through injunction brought in the proper United States court.

■ It next becomes the duty of the court to determine whether or not the statute has been complied with. The Act is simple, definite, and direct in the steps which it requires to be followed, and there has been compliance with all the requirements. No successful challenge can be made that the parties involved are not properly before the court. By no stretch of the imagination could it be said that this is a "purely private labor dispute." The complaint and exhibits thereto make out a prima facie case that the national health and safety are imperiled by the existing strike.

The clear purpose of Section 206 et seq., of the Act is to preserve or restore the uninterrupted flow of commerce pending an opportunity for orderly settlement of controversies which may occur between labor and management, and where a substantial part of the national economy is affected. So in the instant case the preliminary injunction sought would attempt to effect a return to work of the striking employees under the terms of the contract existing at the time the dispute arose, notwithstanding the fact that this court has declared that insistence on certain provisions embraced therein in all probability constitutes an unfair labor practice on the part of the Union.

■ The pleadings and record in this case amply support the necessity for issuance of the preliminary injunction request-

ed. There is no need to labor this point in the light of the present economic crisis. The preliminary injunction will therefore be granted by the court.

Subsequent to issuance of the temporary restraining order, counsel for the Southern Coal Producers Association sought an interpretation by the court of Section 4 of the temporary restraining order, as regards the right of his group thereunder to negotiate independently of the other operator groups. Counsel, in the presence of counsel for the Union, charged that it is the purpose of the Union to destroy the Southern group as an entity. Counsel for the Union disclaimed such intent. The court advised counsel that he had no knowledge of this matter, and therefore no peculiar significance was to be attached to the language employed in Section 4, but that it was the court's view that the order, as drawn, was susceptible of being construed as directing one conference of all groups, although this was not intended.

In the preliminary injunction the language shall be construed as requiring that collective bargaining conferences in good faith be held, without specifying whether or not all operator groups shall meet together.

Counsel will prepare appropriate findings of fact, conclusions of law and order.

### Preliminary Injunction.

This cause having come on for hearing on the application of the plaintiff, United States of America, for a preliminary injunction as prayed for in its complaint, and pursuant to the order of the Court entered February 11, 1950, and the Court having considered all evidence submitted herein, and having considered the verified complaint and exhibits annexed thereto, defendants' pleadings in response thereto, the entire record, proceedings, briefs, and argument of counsel, the Court finds the following facts:

1. On February 6, 1950, the President of the United States, acting under the provisions of Section 206 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 176 (hereinafter referred to as the Act), issued Executive Order 10106, whereby he created a Board of Inquiry to inquire into the issues involved in a labor dispute between certain bituminous coal operators and associations and certain of their employees represented by the International Union, United Mine Workers of America (hereinafter referred to as the Union), involving wages and terms and conditions of employment. In said Executive Order, the President expressed the opinion that such dispute had resulted or threatened to result in a strike or lockout affecting a substantial part of the bituminous coal industry, and industry engaged in trade and commerce among the several States and with foreign nations, and in the production of goods for commerce, which strike or lockout, if permitted to occur or to continue, will imperil the national health and safety.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the dispute and made its written report to the President on February 11, 1950. Such report was submitted in accordance with the provisions of Section 206 of the Act. After receipt of this report, the President directed the institution of this suit, stating that in his opinion the unresolved labor dispute has resulted in a strike affecting a substantial part of an industry engaged in trade and commerce among the several States and with foreign nations, and in the production of goods for commerce, which strike, if permitted to continue, will imperil the national health and safety. The President directed the Attorney General of the United States of America to institute this suit on the part of the United States of America for an injunction against the continuance of the strike and for other appropriate relief.

3. Thereupon, on February 11, 1950, the United States of America brought a suit against the International Union, United Mine Workers of America; John L. Lewis, President, International Union, United Mine Workers of America; and coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 (which said operators and associations are hereinafter sometimes referred to as the "Operators" and which

said National Bituminous Coal Wage Agreement of 1948 is sometimes hereinafter referred to as the "Agreement"). The United States of America filed a verified complaint in which it asked that the defendant Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be enjoined from continuing in whole or in part the strike in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the Agreement; that they be enjoined from in any manner engaging in, permitting or encouraging the said strike or its continuation; that the said Union, acting through its president and other appropriate officers, agents, servants and employees, be ordered to instruct, and to take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; that the defendants, and each of them, be enjoined from engaging in a strike or lockout or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement or from interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines; that the defendants be ordered to engage in free collective bargaining in good faith; that temporary injunctive relief be granted and for other appropriate relief, all as more fully set forth in the complaint.

4. Upon the filing of the verified complaint, and upon plaintiff's application, this Court at 11:20 a. m. on February 11, 1950, issued a temporary restraining order as prayed for by plaintiff, based upon the facts alleged in the complaint and upon affidavits filed in support of the application for the restraining order.

The restraining order by its terms provided that it would expire at 11:20 a. m. on February 21, 1950, unless before such time the order for good cause shown should be extended, or unless the defendants should consent that it be extended for a longer period. For good cause shown, the restraining order was extended to 11:20 a. m. March 3, 1950.

5. Copies of the verified complaint, affidavits annexed thereto, and of the restraining order were duly published and served upon defendants herein, as appears in the returns of service on file in this cause.

6. Responsive pleadings have been filed on the part of certain of the defendants, as more fully appears from the instant record.

7. (a) This suit was instituted under the National Emergencies provisions of the Act, Sections 206–210.

(b) The statutory provisions of Sections 206 to 208 of the Act, and all requirements therein contained, were duly and legally carried out both prior to and in the institution of this suit by the United States of America.

8. The strike by defendant Union consists of a concerted stoppage of work on the part of the Union which has continued since February 6, 1950. This work stoppage is a strike on the part of the Union and does not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

9. The strike on the part of the Union has resulted from unresolved labor disputes affecting wages, hours, terms and conditions of employment attending the failure of the Union and the Operators, or the great majority of the Operators, signatory to the Agreement, to agree to the continuance thereof beyond June 30, 1949, or to execute a successor agreement or agreements.

10. The strike described above is one affecting a substantial part of the bituminous coal industry of the United States.

11. The bituminous coal industry is engaged in trade and commerce among the several States and with foreign nations and in the production of goods for commerce.

12. The strike, if permitted to continue, will imperil the national health and safety.

13. The existing strike, if permitted to continue, will cause irreparable injury to the United States of America for which there is no adequate remedy at law.

The Court makes the following conclusions of law:

1. This suit was instituted under the National Emergencies provisions of the Labor Management Relations Act, 1947, Secs. 206–210, and such provisions are valid and constitutional in all respects.

2. The statutory provisions of Sections 206 to 208 of the Act, and all requirements therein contained, were duly and legally carried out, both prior to and in the institution of this suit by the United States of America.

3. The Court has jurisdiction of the subject matter of the suit and of the parties.

4. The work stoppage is a strike on the part of the Union and does not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

5. The strike is one affecting a substantial part of an industry engaged in trade and commerce among the several states and with foreign nations, and in the production of goods for commerce.

6. The strike, if permitted to continue, will imperil the national health and safety.

7. The strike, if permitted to continue, will cause irreparable injury to the United States of America and to the industry and economy of the United States for which there is no adequate remedy at law.

8. Plaintiff is entitled to the relief prayed for.

Wherefore, upon all of the prior proceedings and upon the foregoing considerations and findings, and it appearing that unless a preliminary injunction is granted herein the existing strike will imperil the national health and safety; and will cause the plaintiff irreparable injury for which it has no adequate remedy at law, and the court being sufficiently advised in the premises,

It Is By The Court This 3rd Day of March, 1950, Ordered:

1. That the defendant, International Union, United Mine Workers of America, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are enjoined pending further order of this Court from continuing, in whole or in part, the strike now in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948, and that the said Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are enjoined pending further order of this Court from in any manner engaging in, permitting or encouraging the said strike or its continuation, in whole or in part.

2. That the said Union, acting through its president and other appropriate officers, agents, servants and employees, forthwith instruct, and take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under the wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; and that the said Union, acting through the said officers, agents, servants, and employees cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue, in whole or in part.

3. That the following defendants, and each of them, and their officers, agents,

servants and employees, and all persons in active concert or participation with them,

International Union, United Mine Workers of America;

John L. Lewis, President, International Union, United Mine Workers of America;

Central Pa. Coal Producers Association;

Floyd County Truck Mine Association;

Georges' Creek and Upper Potomac Coal Association;

Illinois Coal Operators Association;

Illinois Coal Strippers Association;

Indiana Coal Operators Association;

Indiana Coal Producers Association;

Johnson County Truck Mine Operators Association;

Letcher County Truck Mine Operators Association;

Northern Panhandle of West Virginia Coal Operators Association;

Northern West Virginia Coal Association;

Ohio Coal Association;

Retail Coal Producers Association of Greater Johnstown;

Sandy Valley Truck Mine Operators Association;

Somerset County Coal Operators Association;

Southern Ohio Coal Operators Association;

Western Pa. Coal Operators Association;

Southern Coal Producers Association;

Big Sandy-Elkhorn Coal Operators Association;

Greenbrier Smokeless Coal Operators Association;

Harlan County Coal Operators Association;

Hazard Coal Operators Association;

Kanawha Coal Operators Association;

Logan Coal Operators Association;

New River Coal Operators Association;

Operators' Association of Williamson Field;

Pocahontas Operators Association;

Southern Appalachian Coal Producers Association;

Southern Tennessee Coal Producers Association;

Upper Buchanan Coal Operators Association;

Virginia Coal Operators Association;

Winding Gulf Operators Association;

Armco Steel Corporation;

Bethlehem Collieries Corporation;

The Buckeye Coal Company;

Consumers Mining Company;

Crucible Steel Company of America;

H. C. Frick Coke Company;

Geneva Steel Company;

Inland Steel Company;

Jones & Laughlin Steel Corporation;

The Minds Coal Mining Corporation;

Olga Coal Company;

Republic Steel Corporation;

Tennessee Coal, Iron & Railroad Co.;

United States Coal & Coke Company;

Weirton Coal Company;

Wheeling Steel Corporation;

The Youngstown Mines Corporation;

Standard Fire Creek Coal Company;

Tri County Coal Operators Association;

The Union Pacific Coal Company;

Western Kentucky Coal Operators Association;

Coal Division of Eastern Gas and Fuel Associates;

Southwestern Coal Operators Association;

Industrial Collieries Corporation;

American Eagle Collieries Company;

Black Mountain Corporation;

Coal Processing Corporation;

Elkhorn Coal Company;

Raleigh Wyoming Mining Company;

Warner Collieries;

Youghiogheny and Ohio Coal and Coke Company;

New Jellico Coal and Coke Company;

Walter Bledsoe Coal Company;

Emperor Coal Company;

Hellier Coal and Coke Company;

Lillybrook Coal Company;

Westmoreland Mining Company;

West Virginia Coal and Coke Company;

Valley Camp Coal Company;

Crichton No. 4 Mine, Nicholas County, West Virginia;

Diamond Coal Mining Company;

Block Coal and Coke Corporation;

Indian Creek Coal Company;

Consolidation Coal Company of Kentucky;

Brule Smokeless Coal Company;

Red Parrott Coal Company;
C. H. Mead Coal Company;
Utah Coal Operators Association;
Commercial Mines Operating in Alabama;
Jacobs Fork Pocahontas Coal Company;
Buchanan County Coal Corporation;
Page Pocahontas Coal Corporation;
Panther Coal Company, Inc.;
Margaret Ann Coal Company;
Crystal Block Coal and Coke Company;
Red Jacket Coal Corporation;
Home Creek Smokeless Coal Corporation;
Lynn Camp Coal Corporation;
Tennessee Products and Chemical Corporation;
Tennessee Consolidated Coal Company;
Whitwell Coal Corporation;
Kaiser Company, Inc.;
Utah Fuel Company;
Red Jacket Coal Corporation (Coal Mountain, W. Va.);
United Electric Coal Company;
Republic Coal Company;
Stearns Coal & Lumber Company;
Russell Fork Coal Company, Inc.;
Sycamore Coal Corporation;
H. E. Harman Coal Corporation;
Hamill Coal Corporation;
Lee Red Ash Coal Corporation;
Kemmerer Coal Company;
Gunn-Quealy Coal Company;
Arkansas Oklahoma Coal Operators Association;
The American Rolling Mill Company,

be and they hereby are enjoined pending further order of this Court from encouraging, causing or engaging in a lockout or strike or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement, or from in any manner interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines, or from changing, altering or deviating from the wages, hours, terms and conditions of employment set forth in the said Agreement, except by the mutual consent of the Union and the Operator defendant concerned, and from taking any action which would interfere with the Court's jurisdiction, or which would impair, obstruct or render fruitless the determination of this case by the Court.

4. That the defendants engage in free collective bargaining in good faith for the purpose of resolving their disputes and that they make every effort to adjust and settle their differences as contemplated by the National Emergencies provisions of the Labor Management Relations Act, 1947.

5. It Is Further Ordered that this preliminary injunction be and remain in full force and effect until the further order of this Court.