**UNITED STATES of America,**
**Plaintiff,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Atlantic Coast District, ILA, Atlantic and Gulf District, ILA, The New York Shipping Association, Portland Shipping Association, Providence, Rhode Island Shipping Association, New Bedford Stevedoring Corporation, The Steamship Trade Association of Baltimore, Inc., The Boston Shipping Association, Inc., The Philadelphia Marine Trade Association, The Hampton Roads Maritime Association, Inc., South Atlantic Steamship Company, Miami Steamship Association, Mobile Steamship Association, New Orleans Steamship Association, and J. Ross Dunn, Galveston, Texas, Defendants.**

United States District Court
S. D. New York.
Oct. 17, 1959.

William P. Rogers, Atty. Gen., by George Cochran Doub, Asst. Atty. Gen., and Donald B. MacGuineas, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

S. Hazard Gillespie, Jr., U. S. Atty., New York City, Louis Waldman, New York City, for International Longshoremen's Association.

Lorenz, Finn & Giardino, New York City, for New York Shipping Association, by Alfred A. Giardino and Joseph Byrne, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

The Attorney General of the United States, pursuant to the National Emer-

gencies provisions of the Labor Management Relations Act of 1947, the Taft-Hartley Act, 61 Stat. 155, §§ 206–210, 29 U.S.C.A. §§ 176–180, brought the instant proceedings.

The Attorney General is authorized by the aforesaid statutes, upon direction of the President, after receipt of the report of a Board of Inquiry appointed by him, to seek an injunction against the continuance of a strike which imperils the national safety and health. The strike of the employees represented by the International Longshoremen's Association, Atlantic Coast District of ILA, and Atlantic and Gulf District, of ILA, commenced on October 1, 1959, and this strike caused the invoking of the Taft-Hartley provisions by the President of the United States and the issuance of the aforesaid direction to the Attorney General of the United States. The strike resulted from a failure to come to terms on a new labor agreement, the old agreement having expired September 30, 1959.

On October 8, 1959, this court, upon the application of the Attorney General, issued a ten day temporary restraining order against the defendants who, in addition to the union representing the striking employees, included employer associations. This order was granted by a showing that all of the statutory requirements were met and that a continuance of the strike would imperil the national health and safety and would result in irreparable injury.

On the hearing for the temporary restraining order, counsel for the union concerned himself primarily with the terms of the restaining order and the ultimate injunctive decree and did not offer opposition to the issuance of the order itself.

The hearing on the motion for the temporary injunction was set for October 15, 1959. Upon the return day the defendant-union appeared by its attorney as did most of the employer associations. Counsel for the respective participants stated that the government had established a prima facie case for the relief requested and that if the affiants upon whose affidavits the temporary restraining order was based were to give oral testimony they would testify substantially in accord with their affidavits. A similar stipulation was entered into with respect to the testimony of William V. Bradley, President of the International Longshoremen's Association. None of the appearing defendants opposed the granting of the temporary injunction for a period of eighty days, as provided for in the Taft-Hartley Act. However, specific modifications in the terms of the injunction were suggested by counsel for the union and the Shipping Associations which I shall presently discuss.

 Counsel representing the majority of the Shipping Associations has suggested that the injunction be modified so as to include an injunction against "work stoppages or slowdowns." I see no reason for such a modification. No evidence was presented that the union had not completely and in good faith complied with the terms of the temporary restraining order previously issued by this court, and I see no purpose to be served by enjoining activity which would be in effect a violation of the terms of the injunction as issued. The same conclusion was reached in a recent case involving this same industry, see United States v. International Longshoremen's Ass'n, D.C.S.D.N.Y.1956, 147 F.Supp. 425, 428, and no evidence has been presented that the shipping companies were in any way prejudiced by the non-inclusion of the requested language.

 The second modification was requested by the defendant union, and presents a question which has given me some concern. The union requests that a clause be inserted in the injunctive order providing that whatever wages and other monetary benefits are eventually achieved by the union at the bargaining table, be made retroactive to the date of inception of the temporary restraining order. The union argues that in the absence of a retroactivity clause in the injunction, the employers are given a bargaining advantage. Because of

the government's intervention in this dispute, the union says, the employees must go back to work for 80 days under the former terms and conditions of employment and must bargain for retroactivity with the employers. It adds, that in return for agreeing that any final settlement shall be retroactive, the companies are in the position to exact many concessions from the union, and the longer the strike continues, the greater the sum involved and the greater the exactions open to the employers. Furthermore, it is urged that in this industry retroactivity clauses have been customary, and yet in this instance the employers may be able to use at least eighty days of retroactive wages as a bargaining point, while their employees remain at work, unable to use their chief weapon of economic coercion. The union urges finally that such a situation is not conducive to the quick settlement of the labor dispute, an avowed purpose of the act under which this injunction is issued. See 29 U.S.C.A. § 179.

While these arguments have much force and I am convinced that the employers' opposition to the inclusion of such a clause is dictated, at least in part, by their desire to use whatever leverage they derive from their position at the bargaining table, I am of the opinion that the act under which this injunction is issued does not empower me, nor should I in my discretion, if such power is given, deal in the injunction with matters ordinarily left to negotiations between the parties to a labor dispute.

■ Section 178 was enacted to stay strikes or lockouts that would imperil the national health or safety, and to provide for the more speedy settlement of such controversies. As to the matters at issue in the labor disputes themselves, the government, and that includes the courts, are to remain completely neutral. The public interest will best be served by having the courts leave the parties to the dispute in the position in which they were found. Only in this way can the purport of the National Emergencies provisions of the law be carried out—that the court acts in the public interest and not in the adjudication of private contentions of the parties. Other provisions of Title 29 U.S.C.A. evidence legislative intent that the courts should not meddle in the questions actually at issue in the labor controversy. See, e. g., 29 U.S.C.A. §§ 101–115. See also 29 U.S.C.A. § 179(a) "Neither party shall be under any duty to accept, in whole or in part, any proposal of settlement made by the Service." In every instance, where retroactivity clauses were incorporated into injunctive provisions issued pursuant to 29 U.S.C.A. § 178, such was done only to effectuate the policy of preserving the status quo as of the time of the injunction. See United States v. International Longshoremen's Association, supra, where the employers' associations and the union had signed an agreement that all financial arrangements would be retroactive to the date of the expiration of the previous agreement. This retroactivity agreement was in effect at the time of Judge Bryan's ruling. This was not the case here.

Furthermore, the facts here illustrate the wisdom of the expressed legislative policy against dealing with bargainable questions in an action like the present one. While retroactivity clauses may have been previously agreed upon in this industry, it is my understanding that they were acceded to by the employers in return for agreement by the union not to strike immediately upon the expiration of its contract. No such trade of concessions took place in this case. It is true that the equities in this case depend to a great extent on fixing blame for the absence of any such agreement. But, for this court to attempt to consider those equities would demand that it make findings on matters at the heart of the labor dispute itself. I do not think that it is in the best interests of the nation for the courts to use section 178 as a warrant for such interference with the orderly settlement of labor disputes by negotiation between the parties. While what the union urges

that I decree here may benefit it at the bargaining table in this instance, I suggest that its position is short sighted, for on another occasion this precedent, if followed, may work to its decided disadvantage. The public interest and legislative intent require this court to abstain from decreeing matters which should be disposed of by negotiations among the parties.

The application of the government for a temporary injunction is granted and the order signed. Accordingly, having considered all the evidence submitted, the pleadings, affidavits, memoranda and arguments of counsel, I make the following findings of fact and conclusions of law.

### Findings of Fact

1. On October 6, 1959, the President of the United States acting under the provisions of Section 206 of the Labor Management Relations Act, 1947 (29 U.S.C.A. § 176) (hereinafter referred to as the "Act"), issued Executive Order 10842 (24 F.R. 8249), whereby he appointed a Board of Inquiry to inquire into the issues involved in labor disputes between employers (or associations representing such employers) who are (1) steamship companies or who are engaged as operators or agents for ships engaged in service from or to Atlantic and Gulf Coast ports from Searsport, Maine, to Brownsville, Texas, or from or to other ports of the United States in its Territories or possessions; (2) contracting stevedores; (3) contracting marine carpenters; (4) or other employers engaged in related or associated pier activities, and certain of their employees represented by the International Longshoremen's Association, Atlantic Coast District, ILA, and South Atlantic and Gulf District, ILA (hereinafter sometimes referred to collectively as "defendant ILA"). In said Executive Order, the President expressed the opinion that such disputes had resulted in a strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, transportation, trans-

mission or communication among the several States and with foreign nations, which strike, if permitted to continue, would imperil the national health and safety.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the disputes and rendered its written report to the President on October 7, 1959.

3. After receipt of the report, the President, on October 7, 1959, directed the Attorney General, pursuant to the provisions of Section 208 of the Act, to petition in the name of the United States any district court of the United States having jurisdiction of the parties to enjoin the continuance of such strike and for such other relief as may be necessary or appropriate.

4. Thereupon, on October 8, 1959, the Attorney General brought this action on behalf of the United States of America in this District against the following named defendants, to wit:

The New York Shipping Association,
Portland Shipping Association,
Providence, Rhode Island Shipping Association,
New Bedford Stevedoring Corporation,
The Steamship Trade Association of Baltimore, Inc.,
The Boston Shipping Association, Inc.,
The Philadelphia Marine Trade Association,
The Hampton Roads Maritime Association, Inc.,
South Atlantic Steamship Association,
Miami Steamship Association,
Mobile Steamship Association,
New Orleans Steamship Association, and
J. Ross Dunn, Galveston, Texas,

(hereinafter referred to as the "Companies"), and the International Longshoremen's Association, Atlantic Coast District, ILA, and South Atlantic and Gulf District, ILA.

5. (a) Upon the filing of the verified complaint and the accompanying affi-

davits and exhibits and after due consideration thereof, this Court at 7:05 P.M., Eastern Standard Time, on October 8, 1959, issued a temporary restraining order as prayed for by the plaintiff, accompanied by a statement defining the injury, why it was irreparable and why it was granted without notice (except insofar as notice was given to the attorneys for International Longshoremen's Association, Atlantic Coast District, ILA, and South Atlantic and Gulf District, ILA, and The New York Shipping Association, who appeared upon the application therefor), pursuant to Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

(b) The restraining order provided that it would expire at 7:00 P.M., EST, on October 18, 1959, unless before such time the order should be extended for good cause shown, or unless the defendants consent to an extension of the order for a longer period.

6. Copies of the verified complaint, the affidavits annexed thereto, and of the temporary restraining order with the attached statement issued by the Court, were duly served upon defendants International Longshoremen's Association, Atlantic Coast District, ILA, South Atlantic and Gulf District, ILA, The New York Shipping Association, Portland Shipping Association, Providence, Rhode Island Shipping Association, The Steamship Trade Association of Baltimore, Inc., The Boston Shipping Association, Inc., The Philadelphia Marine Trade Association, and The Hampton Roads Maritime Association, Inc., as appears from the returns of service filed herein.

7. The defendant, ILA, upon receipt of notification of the issuance of the temporary restraining order on October 8, 1959, promptly announced that it would direct compliance with the said restraining order by its membership.

8. On or about October 8, 1959, defendant ILA ceased the strike which was in existence on October 1, 1959, and the return of the majority of ILA members, acting in concert, to their normal employment occurred only because of the issuance of the temporary restraining order by this Court on October 8, 1959.

9. Unless the Court grants an injunction, the defendant ILA upon the expiration of said temporary restraining order will resume said strike in the maritime industry from Searsport, Maine, to Brownsville, Texas.

10. This suit was instituted under the national emergencies provisions of the Act, §§ 206–210 (29 U.S.C.A. §§ 176–180).

11. The strike by the defendant ILA consisted of a concerted stoppage of work on the part of the said defendant. This work stoppage was a strike on the part of the ILA and did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act, 29 U.S.C.A. § 143.

12. The strike on the part of the ILA resulted from unresolved labor disputes between employers (or associations by which such employers are represented in collective bargaining conferences) who are (1) steamship companies or who are engaged as operators or agents for ships engaged in service from or to Atlantic and Gulf Coast ports from Searsport, Maine, to Brownsville, Texas, or from or to other ports of the United States or its Territories or possessions, (2) contracting stevedores, (3) contracting marine carpenters, or (4) other employers engaged in related or associated pier activities, and certain of their employees represented by the ILA.

13. The various unresolved issues in the dispute have resulted in the subject strike which affected a substantial part of the maritime industry of the United States, and which also affected a substantial part of the maritime terminal industry of the United States.

14. The maritime industry of the United States is engaged in trade, commerce, transportation, transmission or communication among the several States and with foreign nations.

15. The strike, which commenced on October 1, 1959, and continued until Oc-

tober 8, 1959, when it was terminated following the issuance of the temporary restraining order of this Court, had substantially paralyzed the shipping industry from Searsport, Maine, to Brownsville, Texas, and interfered with and delayed shipments from or to other ports of the United States and its Territories or possessions.

16. The strike in existence up to October 8, 1959, if permitted to resume or to continue, will imperil the national health and safety in the following respects:

(a) It would seriously disrupt inland and off-shore transportation, storage and port operation, thereby resulting in congestion and dislocation of the nation's transportation system and its economy;

(b) It would again, as it did prior to the entry of the restraining order, stop the shipment of both military and non-military supplies to friendly countries which urgently need these shipments not only for defense but to prevent famine and for other reasons essential to the foreign policy of the United States in accordance with the various acts of Congress;

(c) It would delay imports of many materials (such as manganese ores, chrome ores, cobalt, natural rubber, bauxite, mica, tin, asbestos, castor beans, graphite and tungsten) which are essential to the national defense.

17. Such results, if the strike is permitted to resume or to continue, would imperil the national health and safety and thereby cause irreparable damage and injury to the United States of America, for which there is no adequate remedy at law.

## Conclusions of Law

1. This action was properly instituted under the National Emergencies provisions of the Labor Management Relations Act of 1947, Sections 206–210 (29 U.S.C.A. §§ 176–180).

2. The statutory provisions of Sections 206 to 208 of the Act and all requirements therein contained, were in all respects duly and legally complied with, both prior to and in the commencement of this suit by the United States of America.

3. The Court has jurisdiction of the subject matter of this suit and of the parties.

4. The work stoppage was a strike on the part of the ILA and did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

5. The strike is one affecting a substantial part of an industry engaged in trade and commerce, transportation, transmission and communication among the several States and with foreign nations as well as between the United States and certain of its Territories or possessions.

6. The strike, if permitted to continue or to be resumed, will imperil the national health and safety, and thereby cause irreparable injury to the United States of America for which there is no adequate remedy at law.

7. Plaintiff, the United States of America, is entitled to the relief prayed for.